UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROBERT REED, *et al.*,

                 Plaintiffs,

        v.

COUNTY OF WESTCHESTER, *et al.*,

                 Defendants.

No. 20-CV-2268 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances</u>:

Daniel Joshua Wasserberg, Esq.
Jonathan A. Alvarez, Esq.
Kush Shukla, Esq.
Samuel Miles Meirowitz, Esq.
Meirowitz & Wasserberg, LLP
New York, NY
*Counsel for Plaintiffs*

Francesca Lynn Mountain, Esq.
Westchester County Attorney's Office
White Plains, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

       Plaintiffs Robert Reed ("Reed") and Nicole Nazario ("Nazario"; together, "Plaintiffs")

bring this Action, pursuant to 42 U.S.C. § 1983 and New York state law, against the County of

Westchester (the "County"), Westchester County Department of Correction ("WCDOC"),

Commissioner Joseph K. Spano ("Spano"), and ten John Does (collectively, "Defendants"). (*See*

Am. Compl. ("AC") (Dkt. No. 12).) Plaintiffs allege that their former colleague Corrections

Officer Edward Quinoy ("Quinoy") shot and injured them with a gun that Quinoy was permitted

to possess because of his employment for WCDOC. (*Id.*) Plaintiffs claim that Defendants were

negligent and that Quinoy acted consistent with Defendants' policy of tolerating and promoting

violence, including domestic violence. (*Id*.)  Before the Court is Defendants' Motion To Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (*See* Not. of Mot. (Dkt. No. 18).)  For the reasons that follow, the Motion is granted.

## I.  Background

### A.  Factual Background

The following facts are taken from Plaintiffs' Amended Complaint, (AC), and are assumed to be true for the purpose of deciding the Motion.

Quinoy became a corrections officer for WCDOC in August 2008. (*Id*. ¶ 17.)  When their work identification card permits it, WCDOC corrections officers can acquire a 9-millimeter caliber firearm pursuant to N.Y. Penal Law § 265.20. (*Id*. ¶¶ 17, 34.)  Quinoy applied for and was denied a permit for a personal firearm in Rockland County. (*Id*. ¶ 34.)  However, through his employment as a corrections officer, Quinoy obtained a 9-millimeter Sig Sauer P938, serial # 52B086785. (*Id*.)  Quinoy was required to report this acquisition to WCDOC. (*Id*.)

Years before the incident that precipitated the instant Action, Quinoy dated Jane Doe, the daughter of Stephany Doe, a corrections officer for WCDOC. (*Id*. ¶ 18.)  Quinoy and Jane Doe began their relationship in 2010. (*Id*.)  In the summer of 2011, Quinoy was involved in a physical altercation with Jane Doe's ex-boyfriend. (*Id*. ¶ 19.)  In October 2011, Quinoy physically assaulted Jane Doe at her home, dislocating Jane Doe's jaw and knocking out her front tooth. (AC ¶ 20.)  On May 10, 2012, Jane Doe went to the Peekskill Police Department to file a Domestic Incident Report, and reported that Quinoy would not leave her alone and had showed up at her house to see if she was dating someone else. (*Id*. ¶ 21.)  In October 2012, Quinoy physically abused Jane Doe inside her home, including punching her, causing bruising and chest contusions. (*Id*. ¶ 22.)  In November 2012, Quinoy again assaulted Jane Doe in her

home, causing a fractured chest plate.  (*Id*. ¶ 23.)  In March 2013, Quinoy punched Jane Doe in

the face after an argument, causing a fracture of her orbital socket.  (*Id*. ¶ 24.)  In May 2013,

Quinoy showed up at Jane Doe's family party, demanded to see her, threatened her family

members, and attempted to fight her brother.  (*Id*. ¶ 25.)  In the summer of 2013, Quinoy

physically assaulted Jane Doe at a party in front of other corrections officers.  (*Id*. ¶ 26.)  In

November 2013, Quinoy came to Jane Doe's house with a firearm and threatened her, stated that

he could not live without her, and said that he would kill himself or kill her.  (*Id*. ¶ 27.)

After the November 2013 incident, corrections officer Stephany Doe, Jane Doe's mother,

filed a report with the Special Investigation Unit of the WCDOC, notifying it of all of Quinoy's

acts described above.  (*Id*. ¶ 28.)  The report noted that Quinoy had threatened Jane Doe with a

firearm that he obtained as a result of his status as a corrections officer.  (*Id*.)  Defendants did not

thoroughly investigate the claim against Quinoy.  (*Id*. ¶¶ 28–29, 31.)  Defendants did not

separate Stephany Doe and Quinoy after the report, and Stephany Doe was forced to interact

with Quinoy while she worked the employee entrance post.  (*Id*. ¶ 29.)  Quinoy was not

disciplined and he was allowed to keep his firearm.  (*Id*.)  This inaction was contrary to

WCDOC's protocols regarding complaints of violence.  (*Id*.)  WCDOC's protocols required that

Stephany Doe's complaint be reported to WCDOC's Deputy Commissioner and Commissioner.

(*Id*. ¶ 31.)  Despite this requirement, and despite his personal involvement in reviewing Quinoy's

qualifications, hiring him, and retaining him, Spano took no action to retrain or discipline

Quinoy.  (*Id*. ¶ 30–31.)  Plaintiffs allege that this failure to act reflects WCDOC's failure to adopt

and implement policies to comply with New York State Department of Corrections and

Community Supervision ("DOCCS") Directive # 2003, which provides guidance to WCDOC on

handling domestic violence among its employees.  (*Id*. ¶ 32; *see also id.* Ex. A ("Directive") (Dkt. No. 12-1).)

In addition to his domestic abuse, Quinoy had a reputation for unauthorized use of force with fellow corrections officers and inmates.  (AC ¶ 33.)  He was the subject of at least 20 complaints made by inmates, most of which resulted in injury.  (*Id*.)  For example, the day before the incident that precipitated the instant Action, Quinoy was placed on medical leave due to an injury stemming from a physical altercation with an inmate.  (*Id*.)  Despite these numerous complaints, WCDOC did not retrain or discipline Quinoy.  (*Id*.)  As discussed, Spano was personally involved in reviewing Quinoy's qualifications, and was involved in hiring and retaining him.  (*Id*. ¶ 30.)  Despite the many complaints against Quinoy, Spano did not retrain, reprimand, or discipline Quinoy.  (*Id*.)

Plaintiffs allege that Quinoy's pattern of unauthorized use of force is consistent with an "extensive history of lawsuits and other complaints" of WCDOC permitting and encouraging violence by its employees.  (*Id*. ¶ 54.)  Plaintiffs allege that WCDOC has been sued six times for issues including covering up violence, failing to train or investigate, and use of excessive force. (*Id*.)  Plaintiffs also allege that the Department of Justice published a report in 2009, which found inadequate reporting and discipline of officers for using excessive force, among other conduct violating the constitutional rights of incarcerated persons.  (*Id*. ¶ 55; *see also id*. Ex. B ("DOJ Report") 17 (Dkt. No. 12-2).)  Plaintiffs allege that the lawsuits and report suggest "flaws in . . . [D]efendants' violence and/or domestic violence review process."  (AC ¶¶ 56–58.)

Nazario was in a romantic relationship with Quinoy for several years.  (*Id*. ¶ 14.)  On December 7, 2018, Quinoy and Nazario had broken off their relationship, and Nazario had informed Quinoy that she intended to move out of their shared apartment in Haverstraw, New

York.  (*Id*.)  Because Nazario had not yet started her new apartment lease, most of her belongings were at the Haverstraw address.  (*Id*.)

Plaintiffs were both corrections officers at WCDOC.  (*Id*. ¶ 13.)  They met at work approximately one year prior, and had recently started dating.  (*Id*.)  In the afternoon or evening of December 7, 2018, Plaintiffs were at Reed's house in Yonkers, New York.  (*Id*. ¶ 12 (stating that the incident occurred "between 11:00 p.m. and 12:00 a.m."); *see also id*. ¶ 15 (noting that the incident began in the "afternoon").)  Plaintiffs were talking to each other in Reed's bedroom when Reed's cellphone alerted him to motion in his back yard.  (*Id*. ¶ 15.)  Security video on Reed's phone revealed a male on Reed's back deck.  (*Id*.)  Reed showed the video to Nazario, and Nazario confirmed that the male was her ex-boyfriend Quinoy.  (*Id*.)  Speaking through his security system, Reed asked Quinoy to leave the premises immediately.  (*Id*.)  Reed and Nazario then heard a gunshot and shattering glass.  (*Id*.)  Moments later, Quinoy entered the bedroom and opened fire on Plaintiffs.  (*Id*.)  Quinoy shot both Reed and Nazario multiple times.  (*Id*.)  Reed attempted to fire shots back, but ultimately fell on his bathroom floor.  (*Id*.)

Reed's mother was inside Reed's house during the incident.  (*Id*. ¶ 16.)  She called 911, and members of the Yonkers Police Department and emergency medical personnel arrived on the scene.  (*Id*.)  Nazario sustained gunshot wounds to her face and stomach.  (*Id*.)  Reed sustained gunshot wounds to his chest, stomach, liver, pancreas, neck, left shoulder, and right hand.  (*Id*.)  Plaintiffs were transported to Westchester Medical Center for treatment.  (*Id*.)  They survived despite their injuries.  (*Id*. ¶ 15.)  Quinoy died of a self-inflicted gunshot wound to the head.  (*Id*. ¶¶ 15–16.)

Plaintiffs allege negligent hiring, training, supervision, and retention, (*id*. ¶¶ 36–45), negligent entrustment, (*id*. ¶¶ 46–52), and a claim pursuant to 42 U.S.C. § 1983 and *Monell v.*

*Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978), (*id.* ¶¶ 53–64).[1]  Plaintiffs seek

compensatory damages, including past and future medical expenses, punitive damages, pre- and

post-judgment interest, costs, and attorney's fees pursuant to 42 U.S.C. § 1988.  (*Id.* ¶ 70.)

### B.  Procedural Background

Plaintiffs filed their Complaint on February 19, 2020, in New York Supreme Court in the

County of Westchester.  (Dkt. No. 1-1.)  On March 13, 2020, Defendants removed the instant

Action to federal court.  (Dkt. No. 1.)  On April 1, 2020, Defendants submitted a letter requesting

a pre-motion conference in anticipation of filing a motion to dismiss pursuant to Rule 12(b)(6).

(Dkt. No. 4.)  On April 21, 2020, Plaintiffs requested leave to amend their Complaint, (Dkt. No.

6), and the Court granted their request, (Dkt. No. 7).  Plaintiffs filed their Amended Complaint

on May 22, 2020.  (AC.)[2]  On June 8, 2020, Defendants renewed their request for a pre-motion

conference, (Dkt. No. 13), and Plaintiffs opposed on June 12, 2020, (Dkt. No. 14).  The Court

held a pre-motion conference on July 8, 2020, (*see* Dkt. (minute entry for July 8, 2020)), and

adopted a briefing schedule, (Dkt. No. 17).  Defendants filed their Motion on August 31, 2020.

(Not. of Mot.; Decl. in Supp. ("Mountain Decl.") (Dkt. No. 19); Mem. of Law. In Supp. of Defs.'

Mot. ("Defs.' Mem.") (Dkt. No. 20)).  Plaintiffs filed their Opposition on October 15, 2020.

(Pls.' Mem.; Decl. in Opp'n to Defs.' Mot. ("Shukla Decl.") (Dkt. No. 23).)  Defendants filed

---

[1] The Amended Complaint also alleges that Defendants are liable under 42 U.S.C.
§ 1985, (*see* AC ¶¶ 61–63), but Plaintiffs do not contest Defendants' Motion with respect to this
claim, (*see* Pls.' Mem. of Law in Opp'n To Defs.' Mot. ("Pls.' Mem.") 24 (Dkt. No. 24)).  The
Court deems this claim abandoned and does not consider it.  *See Jackson v. Fed. Express*, 766
F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate,
infer from a party's partial opposition that relevant claims or defenses that are not defended have
been abandoned.").

[2] Three days prior, on May 19, 2020, Plaintiffs filed a putative First Amended Complaint,
which the Clerk of the Court deemed deficient.  (*See* Dkt. No. 10.)  The Court does not consider
this submission.

their Reply on November 13, 2020.  (Reply Mem. of Law in Supp. of Defs.' Mot. ("Defs.'

Reply") (Dkt. No. 25).)

## II.  Discussion

### A.  Standard of Review

When ruling on a Rule 12(b)(6) motion to dismiss, the Court must accept all factual

allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.

*Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).  The Court, however, is not required to credit

"mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

(2007)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face."  *Id.* at 678 (quotation

marks omitted).  A claim is facially plausible "when the plaintiff pleads factual content that

allows the [C]ourt to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Id.*  Specifically, the plaintiff must allege facts sufficient to show "more

than a sheer possibility that a defendant has acted unlawfully," *id.*, and if the plaintiff has not

"nudged [his] claims across the line from conceivable to plausible, [the] complaint must be

dismissed," *Twombly*, 550 U.S. at 570.

On a Rule 12(b)(6) motion to dismiss, the question "is not whether a plaintiff will

ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."

*Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012).  Accordingly, the "purpose

of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal

sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding

its substantive merits."  *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (quotation marks

omitted).  To decide the Motion, the Court "may consider the facts as asserted within the four

corners of the complaint together with the documents attached to the complaint as exhibits, and

any documents incorporated in the complaint by reference."  *Peter F. Gaito Architecture, LLC v.*

*Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (quotation marks omitted).

    B.  Analysis

Regarding Plaintiffs' *Monell* claim, Defendants argue that Plaintiffs have not alleged that

Quinoy was acting under color of state law, (Defs.' Mem. 8–11), that Plaintiffs have not pleaded

the denial of a constitutional right, (*id*. at 11), that Plaintiffs do not plead an official policy or

custom, (*id*. at 11–17), and that Plaintiffs have not pleaded supervisory liability as to Spano, (*id*.

at 17–21).  Regarding Plaintiffs' negligence claims, Defendants argue that the Amended

Complaint does not allege that they owed Plaintiffs a duty, because it does not allege that

Defendants knew or should have known that Quinoy was violent.  (*Id*. at 22–25.)  The Court

considers these arguments to the extent necessary.

    1.  Under Color of State Law

Defendant argues that Plaintiffs have not alleged that Quinoy was acting under color of

state law when he shot them.  (*Id*. at 8–11.)  The Court agrees.

"To state a claim under . . . § 1983, the plaintiff must show that a defendant, acting under

color of state law, deprived him of a federal constitutional or statutory right."  *Sykes v. Bank of*

*Am.*, 723 F.3d 399, 405–06 (2d Cir. 2013).  "Congress did not intend municipalities to be held

liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a

constitutional tort."  *Monell*, 436 U.S. at 691.  Thus, "to prevail on a claim against a municipality

under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken

under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4)

damages; and (5) that an official policy of the municipality caused the constitutional injury."

*Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008); *cf. Pitchell v. Callan*, 13 F.3d 545, 549

(2d Cir. 1994) ("If [no individual defendant] inflicted a constitutional injury on [the plaintiff], 'it

is inconceivable that the [municipality] could be liable to [the plaintiff].'" (alterations omitted)

(quoting *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986))); *Albert v. City of New York*,

No. 17-CV-4315, 2018 WL 5084824, at *4 (E.D.N.Y. Oct. 18, 2018) ("*Monell* liability requires,

as a threshold matter, an underlying constitutional violation committed by an employee acting

under color of law . . . ." (quoting *Stoeckley v. City of New York*, 700 F. Supp. 2d 489, 494

(S.D.N.Y. 2010))); *Claudio v. Sawyer*, 675 F. Supp. 2d 403, 410 (S.D.N.Y. 2009) ("The City is

not liable under *Monell* for the private acts of its employees."), *aff'd*, 409 F. App'x 464 (2d Cir.

2011).  To prevail on a claim for supervisory liability, Plaintiffs likewise must satisfy the

elements of a § 1983 claim, including that they were harmed by acts committed under color of

state law.  *See Blyden v. Mancusi*, 186 F.3d 252, 265 (2d Cir. 1999) ("Of course, for a supervisor

to be liable under [§] 1983, there must have been an underlying constitutional deprivation.");

*Santana v. City of New York*, No. 19-CV-211, 2020 WL 6799687, at *4 (E.D.N.Y. Nov. 19,

2020) ("Because [the] [p]laintiffs have failed to sufficiently allege that [the person who shot

them] acted under the color of law, [the] [p]laintiffs['] § 1983 claims against [the shooter] must

fail.  And, given that a § 1983 claim for supervisory liability . . . must be premised on an

underlying constitutional violation by a state actor, [the] [p]laintiffs' [supervisory liability]

claims . . . similarly fail.").  Indeed, that the plaintiff was harmed by acts committed under color

of state law is "a jurisdictional requisite for a § 1983 action."  *Polk County v. Dodson*, 454 U.S.

312, 315 (1981).

"[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *West v. Atkins*, 487 U.S. 42, 50 (1988).  On the other hand, "acts of officers in the ambit of their personal pursuits are plainly excluded" from those acts that are under color of state law.  *Pitchell*, 13 F.3d at 548 (quoting *Screws v. United States*, 325 U.S. 91, 111 (1945) (plurality opinion)).  "[T]here is no bright line test for distinguishing 'personal pursuits' from activities taken under color of law." *Id*.  Thus, "[m]ore is required than a simple determination as to whether an officer was on or off duty when the challenged incident occurred."  *Id*.; *see also Rivera v. La Porte*, 896 F.2d 691, 695 (2d Cir. 1990) ("The off-duty status of an arresting officer does not mean that he is not acting under color of law.").  And "[a]cts of officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it."  *Screws*, 325 U.S. at 111. Thus, courts consider a variety of factors in assessing whether a defendant acted under color of state law, including whether the officer identified himself as an officer (e.g. by flashing a badge), if the plaintiff was aware that the defendant was an officer (e.g. because he was in uniform), if the defendant drew a firearm or was carrying weapons or handcuffs, if the defendant detained or arrested the plaintiff or was authorized to make an arrest, if the defendant was engaged in an investigation or other traditional police public safety function, and if the defendant was off-duty. *Cooper v. City of New York*, No. 17-CV-1517, 2018 WL 4762248, at *6 (E.D.N.Y. Sept. 29, 2018); *Wahhab v. City of New York*, 386 F. Supp. 2d 277, 288 (S.D.N.Y. 2005).

Two Second Circuit cases are instructive.  The first is *Pitchell*.  There, the defendant was an off-duty police officer.  13 F.3d at 546.  He met the plaintiff and two other individuals at a local bar after the defendant's shift ended.  *Id*.  The defendant was in partial uniform at the bar. *Id*.  After the bar closed, the plaintiff and the defendant went to the defendant's apartment to

continue drinking.  *Id*.  The defendant changed into civilian clothes upon arriving at his

apartment.  *Id*.  At the apartment, the parties discussed a variety of topics, including Vietnam,

former President Kennedy, and the movie "Platoon."  *Id*.  At approximately 3 a.m., the defendant

went into another room and emerged with a gun.  *Id*.  This was the defendant's personal gun, but

it was loaded with bullets issued by the Hartford Police Department.  *Id*.  The defendant said,

"Now what did you say about Kennedy?", and shot the plaintiff, causing permanent injury.  *Id*.

The second case is *Bonsignore v. City of New York*, 683 F.2d 635 (2d Cir. 1982).  There, an off-

duty police officer shot and seriously wounded his wife, then committed suicide by shooting

himself in the head.  *Id*. at 636.  The attacker was required by his employer, the New York Police

Department ("NYPD"), to carry a gun at all times while in New York City.  *Id*.  The attacker

used this "off-duty" .32 caliber revolver to shoot his wife.  *Id*.

      Following these cases, two primary factors suggest that Quinoy was not acting under

color of state law.  First, the Complaint implicitly acknowledges that Quinoy was off-duty and it

does not allege that he invoked his authority as a corrections officer, two facts that this case

shares with *Pitchell*.  *See* 13 F.3d at 548 (noting that the defendant was "off-duty" and did not

"invok[e] the authority of the police department").  In *Bonsignore*, the Second Circuit likewise

noted that the attacker was "off-duty" and "his actions were not 'committed in the performance

of any actual or pretended duty.'"  683 F.2d at 638–39 (citation omitted).  Here, Quinoy

allegedly appeared at Reed's house—not a facility where a corrections officer would be on

duty—and opened fire "within moments" of entering.  (AC ¶ 15.)  Plaintiffs do not allege that

Quinoy said anything during the incident.  (*See generally id.*)  Thus, the fair inferences is that

"the [A]mended [C]omplaint does not allege that [Quinoy] purported to act with state authority

when he . . . shot [Plaintiffs]." *Claudio*, 675 F. Supp. 2d at 409.[3]  Second, Quinoy acted based

on a personal dispute.  Quinoy attacked his ex-girlfriend Nazario and her new boyfriend Reed.

(AC ¶ 13.)  The attack occurred shortly after their relationship fell apart; Nazario had informed

Quinoy that she planned to leave, but had not yet moved most of her belongings out of their

shared apartment.  (*Id*. ¶ 14.)  The attack echoed Quinoy's 2013 threat to Jane Doe, an earlier

romantic interest, "that he cannot live without her and will kill himself or kill her."  (*Id*. ¶ 27.)

Similarly, in *Pitchell*, the Second Circuit noted that the defendant "while drunk in his own home,

used his . . . weapon to shoot a guest."  13 F.3d at 548.   In *Bonsignore*, the Second Circuit

likewise held that the attacker shot his wife while acting "in the ambit of his personal pursuits."

683 F.2d at 639.

       Plaintiffs argue that "Quinoy was acting under color of law as . . . Quinoy: (i) had a

firearm obtained solely through his employment as a correctional officer; and (ii) was

identifiable as a correctional officer to Plaintiffs due to their familiarity with him."  (Pls.' Mem.

20.)  The Court is not persuaded by either argument.

       That Quinoy owned his gun because of his employment with WCDOC does not suffice to

establish that he was acting under color of state law.  In *Bonsignore*, the Second Circuit held that

an attacker was not operating under the color of state law when he shot his wife with the gun that

the police department required that he carry while off-duty.  683 F.2d at 636, 638–39.  In

*Pitchell*, the Second Circuit reached the same conclusion where the defendant shot the plaintiff

using his personal gun and bullets issued by the police department.  13 F.3d at 546, 548.  While

the facts here are not identical, *Bonsignore* and *Pitchell* establish that an off-duty officer is not

---

[3] Plaintiffs attempt to distinguish *Claudio*, but refer to the wrong opinion.  (*See* Pls.'
Mem. 23; Defs.' Reply 5.)

acting under color of state law merely because the state furnished the weapons used in an assault. *See Barna v. City of Perth Amboy*, 42 F.3d 809, 818 (3d Cir. 1994) ("[T]he unauthorized use of a police-issue nightstick is simply not enough to color this clearly personal family dispute with the imprimatur of state authority."); *Stoeckley*, 700 F. Supp. 2d at 493–94 (holding that "*Pitchell* and *Bonsignore* rejected substantially the . . . argument" that an off-duty officer "acted under color of law because NYPD . . . required him, unless otherwise directed, to be armed at all times when in New York City"); *Claudio*, 675 F. Supp. 2d at 409–10 ("The mere use of a department-issued weapon is not sufficient to hold that an off-duty officer was acting under color of law without more indicia of authority.").  "To hold otherwise would create a federal cause of action out of any unauthorized use of a police-issue weapon, without regard to whether there are any additional circumstances to indicate that the officer was exercising actual or purported police authority." *Barna*, 42 F.3d at 819.

Nor does the fact that Plaintiffs recognized Quinoy to be a corrections officer establish that he acted under the color of state law.  The Second Circuit has held as much in cases where the assailant's status as a police officer was obvious to the plaintiff.  For example, in *Pitchell*, the defendant "was in partial uniform at the bar" while speaking with the plaintiff.  13 F.3d at 546. Despite this signal that the defendant was an agent of the state, the Second Circuit held that he was not acting under the color of state law during the incident at issue, in part because he did not "invok[e] the authority of the police department."  13 F.3d at 548.  The Second Circuit reached the same conclusion in *Bonsignore*, where the plaintiff was assaulted by her police officer husband.  683 F.2d at 636.  In *Delcambre v. Delcambre*, 635 F.2d 407 (5th Cir. 1981)—an opinion cited approvingly by the Second Circuit in *Pitchell*, 13 F.3d at 548—the Fifth Circuit found that the defendant was not acting under color of state law even though the altercation

occurred "on the premises of the municipal police station" and the defendant at the time "was on duty." *Delcambre*, 635 F.2d at 408.[4]

The Court agrees with Defendants that the cases cited by Plaintiffs are distinguishable. (*See* Defs.' Reply 3–4.)  In *Jocks v. Tavernier*, 316 F.3d 128 (2d Cir. 2003), the officer "displayed his shield and identified himself as a police officer at the same time as he drew his pistol." *Id*. at 134.  In *Davis v. Lynbrook Police Dep't*, 224 F. Supp. 2d 463 (E.D.N.Y. 2002), the officer

> in essence[] effectuated a traffic stop by repeatedly flashing his lights to notify [the plaintiff] to pull over . . . , inform[ed] [the plaintiff] that he was a police officer and flash[ed] what appeared to be a badge . . . , drew his firearm, pointed it at [the plaintiff] and asked him, "You think I'm a cop now?," . . . [and] asked [the plaintiff] questions that police officers typically ask motorists during a traffic stop or suspects apprehended on the street.

*Id*. at 476.  Finally, in *DeVito v. Barrant*, No. 03-CV-1927, 2005 WL 2033722 (E.D.N.Y. Aug. 23, 2005), the defendant "flash[ed] his badge[] and identif[ied] himself as a police officer in an attempt to apprehend [the] plaintiff." *Id*. at *5.  Here, by contrast, Plaintiffs do not plead that Quinoy "invok[ed] the authority of the [corrections] department." *Pitchell*, 13 F.3d at 548.

---

[4] While courts have found that an official acted under color of state law where they acted while performing neither "any actual or pretended duty," *Bonsignore*, 683 F.2d at 639 (citation omitted), these cases involved threats of retaliation through improper future use of official authority.  In *United States v. Giordano*, 442 F.3d 30 (2d Cir. 2006), the Second Circuit found that the former mayor of Waterbury, Connecticut acted under color of state law where he threatened the minors that he was sexually abusing that they would go to jail if they reported anything, and repeatedly indicated that he was heavily involved in police business. *Id*. at 45–46. Similarly, in *Margolies v. Millington*, No. 16-CV-1872, 2017 WL 2111414 (D. Conn. May 15, 2017), the district court found that the officer who beat and kicked the plaintiff was acting under color of state law because he "invoked the authority of the state during the altercation . . . by informing [the plaintiff] not to resist because he was an officer." *Id*. at *2, *4.  Here, by contrast, the Amended Complaint contains no claims that Quinoy threatened Plaintiffs with adverse official action.  (*See generally* AC.)

14

Plaintiffs also argue that the Court should be "reluctant to dismiss [Plaintiffs'] claims without some form of discovery."  (Pls.' Mem. 23.)  Plaintiffs are correct that both *Pitchell* and *Bonsignore* were decided after discovery—*Pitchell* on summary judgment, 13 F.3d at 546, and *Bonsignore* after trial, 683 F.2d at 636.  However, courts have dismissed § 1983 claims on the pleadings where they failed to allege that an official was acting under the color of state law.  *See Cooper*, 2018 WL 4762248, at *7 (dismissing § 1983 claim where the plaintiff did not allege that the officer "(1) was on-duty at the time of the altercation; (2) identified himself as an officer of the law; (3) wore a uniform or carried handcuffs; (4) revealed a police badge; or (5) placed plaintiff under arrest or otherwise detained him"); *Claudio*, 675 F. Supp. 2d at 409–10.[5]  The case Plaintiffs cite for this proposition— *Abdelaziz v. City of New York*, No. 13-CV-7268, 2016 WL 1465355 (E.D.N.Y. Apr. 14, 2016)—in inapposite.  There, the district court described the case as "fact-intensive," and noted that the plaintiff and the officer had conflicting accounts of who was the aggressor.  *Id.* at *2 (noting that the plaintiff claimed that the officer "initiated a physical fight," and that the officer claimed that the plaintiff "punched him in the face").  Here, the Court has accepted Plaintiffs' claims as true.  Plaintiffs argue that discovery may reveal whether "Quinoy (i) use[d] any tools obtained from his job to enter Plaintiffs' residence; (ii) [wore] any officer clothing and/or badge at the time of the incident; and (iii) use[d] his training and knowledge obtained from his employment during the incident."  (Pls.' Mem. 24.)  However, in the absence of allegations plausibly suggesting that discovery may reveal evidence consistent with this speculation, "Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Iqbal*, 556 U.S. at 678–79.  Further, even if discovery

---

[5] Based on a citation error in Defendants' opening brief, Plaintiffs inaccurately argue that Defendants misquoted *Cooper*.  (*See* Pls.' Mem. 23; Defs.' Reply 5.)

reveals all of these facts, they are immaterial.  As discussed, that WCDOC furnished the means

for the attack and that Plaintiff was identified as an officer do not establish that Quinoy acted

under color of state law.  *See Pitchell*, 13 F.3d at 546, 548 (finding that the defendant was not

acting under the color of state law where he shot the plaintiff using bullets issued by the police

department and "was in partial uniform" while speaking with the plaintiff); *Bonsignore*, 683 F.2d

at 636, 638–39 (holding the same where the police officer defendant shot his wife with the gun

he was required to carry while off-duty).  Further, Plaintiffs have cited no case law suggesting

that the origin of Quinoy's training and knowledge bears on the question of whether he acted

under color of state law, (*see generally* Pls.' Mem.), nor is the Court aware of any.

Thus, Plaintiffs' § 1983 claim is dismissed.[6]

### 2.  Supplemental Jurisdiction

As the Court has dismissed Plaintiffs' federal claim, it declines to exercise supplemental

jurisdiction over their New York law claims.  *See Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d

Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims

should be dismissed as well."); *Thomas v. Grunberg 77 LLC*, No. 15-CV-1925, 2017 WL

3263141, at *1 (S.D.N.Y. July 28, 2017) (dismissing state claims where the federal claims had

been mooted); *Torres v. City of New York*, 248 F. Supp. 2d 333, 334 (S.D.N.Y. 2003) ("Where

the basis for pendent jurisdiction is dismissed, ordinarily so should the state law claims be

dismissed.").

---

[6] Because the failure to allege that Quinoy acted under color of state law is sufficient to dismiss Plaintiffs' § 1983 claim, the Court does not consider Defendants' arguments that Plaintiffs have not pleaded the denial of a constitutional right, (Defs.' Mem. 11), that Plaintiffs do not plead an official policy or custom, (*id*. at 11–17), and that Plaintiffs have not pleaded supervisory liability as to Spano, (*id*. at 17–21).  Plaintiffs may address these arguments if they elect to file a second amended complaint.

### III.  Conclusion

For the foregoing reasons, Defendants' Motion To Dismiss is granted.  Because this is the first adjudication of Plaintiffs' claims, this dismissal is without prejudice.  Plaintiffs may file a second amended complaint within 30 days of the date of this Opinion & Order.

The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 18).

SO ORDERED.

DATED:          June 11, 2021
               White Plains, New York

                                                    _____
                                                    KENNETH M. KARAS
                                                    UNITED STATES DISTRICT JUDGE

17